**Brenda A. JAMES**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION.**

Civ. A. No. 88–6285.

United States District Court,
E.D. Pennsylvania.

May 17, 1990.

Frederick C. Timm, Philadelphia, Pa., for plaintiff.

K. Robert Conrad, Deborah K. Wright, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Plaintiff Brenda James, a black female, filed an amended complaint on September 27, 1989, asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, 42 U.S.C. § 1981, 42 U.S.C. 1985(3), and state law. Defendant International Business Machines Corporation ("IBM") moves for partial summary judgment on the grounds that the Title VII claims which were not asserted in a timely way before the Equal Employment Opportunity Commission ("EEOC") or the Pennsylvania Human Relations Commission ("PHRC") are barred and that IBM is entitled to judgment as a matter of law on the claims of sexual harassment, violations of sections 1981 and 1985(3), and violations of state law. I will grant IBM's motion for partial summary judgment. The only remaining issues for trial are the timely Title VII claims.

### I. Background

James was employed by IBM as an account administrator from March 16, 1977, until October 27, 1988. James alleges in her amended complaint that she was informed by one of her superiors that she could expect promotion to management. Compl., at ¶ 7. James never received the promotion. She contends that white and male employees, who began their employment at the same time as she, have been promoted to managerial positions with IBM. Compl., at ¶ 10.

In July, 1983, James filed a charge of racial and gender discrimination with the

Philadelphia office of the EEOC alleging that IBM's refusal to promote her was on account of her race and sex. IBM, at the request of the EEOC, investigated her complaints but did not find any evidence of discrimination. The EEOC issued a "right-to-sue" letter on May 11, 1984. James allowed the ninety day "right-to-sue" period to elapse without instituting a legal action. She blames certain IBM agents who she claims "prevailed upon plaintiff not to file ... [a civil complaint] ... by promises to plaintiff that she would be evaluated for a management program at the end of a six-month time period." Compl., at ¶¶ 12 and 13. James admits in deposition testimony, however, that she was not forced or pressured by any IBM agents to drop her discrimination complaints nor was she promised a managerial slot. James' Dep., at 470–74. At the end of the six-month review period, James was denied a management position, and instead was offered and later accepted a lateral transfer within IBM.

Over the ensuing years, James became dissatisfied with her new job at IBM. As a result, she filed a second EEOC charge on June 18, 1987. In that complaint, James alleged that she was a victim of harassment at the hands of her supervisor who refused to allow her to attend a training seminar, evaluated her unfairly, and expressed annoyance at her behavior, and that she was subject to racial and gender discrimination because she was again denied a promotion to management. The EEOC issued a "right-to-sue" letter on May 18, 1988.

The instant action was filed in this court on August 15, 1988, within the ninety-day filing period. The complaint, in its original form, contained all of the allegations raised in her first and second charges filed with the EEOC. Specifically, James charged that IBM discriminated against and harassed her on account of her race and sex. She brought her claims under Title VII, sections 1981 and 1985(3), and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.S.A. § 951 et seq.

During the last few months of her employment with IBM, James refused to show up for work. She claimed that she was so handicapped by virtue of an alleged job-related illness that she could not perform her assigned tasks. On October 27, 1988, James was fired. IBM asserts that she was discharged for unauthorized absences.

Thereafter, on February 16, 1989, James filed a complaint with the PHRC charging IBM with discriminating against her in violation of the PHRA. She raised essentially the same allegations that formed the basis for her federal complaint, but added claims of handicap discrimination and retaliatory discharge. However, James failed to notify the PHRC that a federal complaint based on the same claims had been filed six months before. See Exhibit E, attached to IBM's motion for partial summary judgment. She received a "right-to-sue" letter from the EEOC pertaining to the PHRC charge on December 20, 1989.

In her amended complaint, James alleges that IBM violated Title VII by discriminating against her because of her race and gender (count I), that IBM violated the PHRA, by discriminating against her because of her race, gender, and illness, which she asserts is a cognizable handicap (count II), that IBM violated section 1981 by "acting against plaintiff due to her race in refusing to promote her, harassing her (sexually and otherwise) and discharging her" (count III), that IBM violated section 1985(3) by conspiring to discriminate against her because of her race (count IV), that IBM intentionally, purposefully, wilfully, and outrageously inflicted emotional distress upon her in violation of Pennsylvania law (count V), that IBM violated the "public policy of the Commonwealth of Pennsylvania" by discharging her in retaliation for her "pressing her rights to workers' compensation benefits" (count VI), and that IBM breached "written, oral and implied" contracts for failing to pay her sick-pay benefits (count VII).

IBM denies that James was subject to discrimination, harassment, or retaliation of any kind during the employment relationship. IBM maintains that James was

simply not qualified for a management position because she lacked the interpersonal and leadership skills necessary for the job. IBM further points out that it has exercised more patience and good faith than was required under the circumstances and only discharged James after repeated requests that she return to work went unheeded.

## II. Title VII

James concedes that a number of the Title VII claims on which she seeks to recover were not timely presented to the EEOC or PHRC[1] and are now barred. Specifically, James concedes that she is barred from recovery on any alleged violations of Title VII which occurred more than 240 days before she filed her second EEOC charge. 42 U.S.C. § 2000e-5(f)(1); *Seredinski v. Clifton Precision Products Co.*, 776 F.2d 56, 61 (3d Cir.1985). Thus, any claims for alleged violations of Title VII which occurred before October 26, 1986, 240 days prior to June 18, 1987, are barred. This eliminates her claims for alleged breaches of promises of promotion in 1983 through 1985, for the alleged unfair evaluations of her work in 1985 and in March, 1986, and for the alleged denial of promotion in 1986. Of course, it also eliminates any claims that formed any part of James' first complaint to the EEOC, which was filed over three years before the October 26, 1986, cut-off. Additionally, James concedes that she is barred from recovery on any alleged violations of Title VII raised in the PHRC charge but which occurred prior to June 22, 1988, 240 days before she filed her PHRC charge. Thus, James may not recover for her supervisor's alleged mistreatment of her, the denial of the opportunity to take an examination which would have qualified her for promotion, and the denial of promotions between January and September, 1986.

IBM argues that James is precluded from raising in her amended complaint any Title VII claim that was not the subject of either the second EEOC or PHRC charges. I agree. However meritorious, James' Title VII claims that were not presented directly to the EEOC or to the EEOC by way of the PHRC charge must be dismissed. *See, e.g., Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977) (scope of civil action in district court is defined by EEOC charge and investigation); *Boyd v. Houston Northern*, 1988 WL 68732, 1988 U.S. Dist. Lexis 6296 (E.D.Pa. June 29, 1988), *aff'd without op., Boyd v. Matenero*, 888 F.2d 1379 (3d Cir.1989) (claims of improper delay in hiring and improper opposition to an application for unemployment compensation not contained in EEOC charge alleging discriminatory discharge must be dismissed). Therefore, since James did not raise in either the second EEOC or PHRC charges her claims that IBM agents prevailed upon her not to sue on the first EEOC charge, made racially derogatory remarks to her, and sexually harassed her, these claims are barred.

Yet, James contends that she has established a continuing violation of the civil rights laws which revives all of her claims. In the alternative, James maintains that she should be allowed to introduce all relevant evidence of any past event as it may help her prove her timely claims. I will address each argument in turn.

First, James cannot establish a continuing violation on the part of IBM to defeat the operation of Title VII's time limits. A conclusory allegation of "continuing violation" is not a substitute for factual support on that point. To prevail on a continuing violation theory, James must show that IBM had a standard and pervasive practice of intentionally discriminating against or

---

**1.** As discussed more fully below, at 1426–1427, I will grant summary judgment to IBM on James' allegation that it discriminated against her in violation of the PHRA. For the same reasons, I will not discuss any allegation in the PHRC charge that IBM violated the PHRA. However, because the acts that James alleges violate the PHRA would, if true, also violate Title VII, I will consider those allegations to be properly before me and will address them only in the Title VII context. This conclusion is justified in light of the fact that the EEOC received a copy of her PHRC charge and later issued to her a "right-to-sue" notice.

harassing a class or classes of employees of which she was a member. *Jewett v. International Telephone & Telegraph Corp.*, 653 F.2d 89, 91–92 (3d Cir.1981). James has not even come close to meeting this burden. James has submitted no exhibits, affidavits, or other documentation to show that IBM engaged in a practice, much less a pervasive practice, of intentional discrimination or harassment. Quite plainly, there has been no showing that the incidents which are in issue here are anything but isolated, although unfortunate, acts. Her complaint and affidavit attached to her response to defendant's motion reveal nothing more than separate acts of discrimination and harassment committed by a small number of management and non-management employees over a seven-year period. The allegations of continuing violation are unsupported, and standing alone are not sufficient to create a material issue of fact.

Second, James' alternative argument may or may not have greater merit, but at this point in the proceedings it would be premature to rule on the relevance of any particular piece of evidence to the issues at trial. Therefore, I will defer ruling on the admissibility of James' untimely and unpresented claims as corroborative evidence until the appropriate juncture of the trial.

### III. Section 1981

■ Count III of the amended complaint charges that IBM violated 42 U.S.C. § 1981 by refusing to promote, harassing, and finally discharging James because of her race. James concedes that the harassment and improper discharge claims are not actionable under section 1981. *See Patterson v. McClean Credit Union*, —— U.S. ——, ——, 109 S.Ct. 2363, 2373, 105 L.Ed.2d 132 (1989) (section 1981 does not reach "conduct by the employer after the contract relationship has been established, including breach of the terms of the con-

tract or imposition of discriminatory working conditions."). IBM argues that James' claim that she was denied promotion because of her race is also not actionable, because James cannot show that any promotion she sought would have constituted a "new and distinct relationship" between IBM and her.[2]

*Patterson*, 109 S.Ct. at 2377, requires the plaintiff in a section 1981 action to show that the requested promotion would have created a "new and distinct relationship" between the aggrieved employee and her employer. *Patterson* instructs that the term "new and distinct relationship" should be narrowly construed to include only those situations where a new contract of employment is formed or where a fundamental change occurs in the nature of the relationship, such as in *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). *See, e.g., Malhotra v. Cotter & Co.*, 885 F.2d 1305 (7th Cir.1989) (routine advancement for existing employees is not actionable under section 1981); *Williams v. National Railroad Passenger Corp.*, 716 F.Supp. 49 (D.D.C.1989) (promotion that just provides for an increase in pay does not create a new and distinct relationship). In *Hishon*, a case cited by the *Patterson* Court as an example of a "new and distinct relationship," the plaintiff, a female associate in a law firm, was discriminatorily denied the opportunity to become a partner in the firm, a change that would have made her an employer instead of an employee. Here, the change in the relationship would be less drastic. In fact, IBM management positions differ from non-management positions only in responsibility and compensation. In either job, James would have remained an IBM employee and the relationship would have been governed by the same employee handbook.

---

**2.** The amended complaint does not specify what positions were denied James. It only alleges that James sought to advance from a non-management to a management position. Therefore, this somewhat nebulous claim does not include the denial of the opportunity to take the systems engineering test since that position is merely a lateral transfer and not a management

spot. Additionally, only the denial of promotions between August 16, 1986, and October 27, 1988, may form the basis for her section 1981 action because of the two year statute of limitations applicable to these claims. *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985).

On the other hand, James argues that a "new and distinct relationship" would have resulted from the promotion because as a manager she would no longer receive overtime pay and she would be issued an IBM internal policy pamphlet entitled the "Manager's Manual." Nevertheless, these changes do not equate to a "new and distinct relationship." The transition from hourly compensation to salary is not the type of change in the employment relationship that the Supreme Court envisioned as evidence of a "new and distinct relationship." The Manager's Manual is not a new contract of employment nor does it change the terms of employment in such a fashion so as to alter the existing contract of employment. Rather, it is an internal memorandum issued to management employees to assist them in their daily activities. It, too, is neither evidence of a "new and distinct relationship," nor does it create one. The *Patterson* court intended that promotion claims under section 1981 be the exception rather than the rule. Since a promotion to management would not satisfy the requirements of *Patterson*, summary judgment will be granted in favor of IBM on James' section 1981 claim for racially discriminatory failure to promote.

## IV. State Law Claims

### A. Pennsylvania Human Relations Act

■ In count II of the amended complaint, James asserts that IBM violated the PHRA when she was allegedly denied promotions, harassed, and discharged because of her race, gender, and claimed handicap. James' original complaint filed in this court contained the same allegation that IBM violated the PHRA. Some six months after filing her federal action, on February 16, 1989, James filed a complaint with the PHRC, again charging IBM with violating the PHRA. IBM moves for summary judgment on count II on the grounds that James' federal action was filed before the PHRC had sufficient time to conduct its investigations. I will deny IBM's motion for summary judgment on the grounds asserted by it, but, nevertheless, summary judgment in favor of IBM is appropriate for the reasons that follow.

The Pennsylvania Supreme Court has recently announced that an action for a violation of the PHRA must be brought in accordance with the terms of that statute. *Clay v. Advanced Computer Applications*, 522 Pa. 86, 559 A.2d 917, 919 (1989).[3] The court in *Clay* reversed a superior court ruling which granted to the aggrieved employee the option of filing a civil action or proceeding through the PHRA. *Id.*, 559 A.2d at 921. The high court held that where an at-will employee claims to have been wrongfully terminated or discriminated against in violation of the PHRA, *i.e.*, when the PHRA is invoked, her sole remedy is to proceed under the provisions of the PHRA, which includes the filing of a charge with the PHRC. *Id.* In other words, an aggrieved employee is not at liberty to commence a civil action grounded on a violation of the PHRA without first presenting her claim to the PHRC. *Id.* The court reasoned that:

> there is no basis for belief that there was intended to be broad and unrestricted access to civil actions, outside of the PHRA, alleging discriminatory termination of at-will employment. The intended forum for addressing grievances of the sort presented in this case is the PHRC.

**3.** The PHRA provides in pertinent part:

§ 962(b)— ... the procedures herein provided shall, when invoked, be exclusive and the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the complainant concerned. If the complainant institutes any action based on such grievance without resorting to the procedure provided in this act, such complainant may not subsequently resort to the procedure herein.

§ 962(c)— ... In cases involving a claim of discrimination, if a complainant invokes the procedures set forth in this act, that individual's right of action in the courts of the Commonwealth shall not be foreclosed. If within one (1) year after the filing of a complaint with the Commission, the Commission dismisses the complaint or has not entered into a conciliation agreement to which the complainant is a party, the Commission must so notify the complainant. On receipt of such a notice the complainant shall be able to bring an action in the courts of common pleas of the Commonwealth based on the right to freedom from discrimination granted by this act.

*Id.,* 559 A.2d at 921.[4] Here, James invoked the PHRA when she brought her claim that IBM violated it in this action. However, she did not, of course, exhaust her remedies under the PHRA as required by it and *Clay.* From the moment she included in her federal complaint her PHRA claim without first complying with the statutory mandate therein, it was fatally flawed.[5] Accordingly, IBM will be granted summary judgment on count II.

### B. Intentional Infliction of Emotional Distress

 I will also grant summary judgment in favor of IBM on plaintiff's claim for intentional infliction of emotional distress for a number of reasons. First, the exclusivity provision of the Pennsylvania Workmen's Compensation Act bars an employee's recovery on claims for intentional infliction of emotional distress. 77 Pa.S.A. § 481(a). *See Gonzalez v. CNA Insurance Co.,* 717 F.Supp. 1087, 1088 (E.D.Pa.1989); *McBride v. Bell of Pennsylvania,* 1989 WL 71545, 1989 U.S. Dist. Lexis 7177 (E.D.Pa. June 27, 1989). James asserts that because she withdrew her workmen's compensation claim and the time for filing a second claim has passed, she should be excused from compliance with the Act. However, there is no such exception. *See, e.g., Chinnery v. Government of Virgin Islands,* 865 F.2d 68, 71 n. 4 (3d Cir.1989) ("Obviously, an employee by foregoing an exclusive remedy may not create another basis for recovery."). Proceeding under the Act is the only means of recovery for on-the-job injuries.

 Second, the Pennsylvania Supreme Court does not permit an employee to recover for an alleged intentional tort arising out of the employment context. *Poyser v. Newman & Co., Inc.,* 514 Pa. 32, 522 A.2d 548, 550–51 (1987). Here, James complains solely of an emotional injury as a result of intentional acts, whereas in *Poyser,* the plaintiff complained of a physical injury. I see no reason to distinguish *Poyser* on that ground or to distinguish for any other reason the federal decisions which rely on it.

 Lastly, I also conclude that even if James' intentional infliction of emotional distress claim was not barred by the Workmen's Compensation Act or by *Poyser,* IBM's conduct does not rise to the level of outrageousness necessary to state an intentional infliction of emotional distress claim. Only that conduct which goes beyond all bounds of decency and would be regarded as intolerable in a civilized society may support a claim for intentional infliction of emotional distress. *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir.1988). *See, e.g., Paul v. Lankenau Hospital,* 375 Pa.Super. 1, 21, 543 A.2d 1148, 1158 (1988), *appeal granted,* 520 Pa. 607, 553 A.2d 969, *appeal denied,* 520 Pa. 618, 554 A.2d 510 (1989), *aff'd in part,* and *rev'd in part, on other grounds,* —— Pa. ——, 569 A.2d 346 (1990) (claim for intentional infliction made out where conduct is so outrageous and extreme to go beyond all bounds of decency).

In addition, in recent years a number of courts have dismissed intentional infliction claims where, as here, an employer has allegedly harassed an employee to the point of termination. *See, e.g., Liakakos v. Cigna Corp.,* No. 87–0390 slip op. at 5, 1989 WL 5325, 1989 U.S. Dist. Lexis 739 (E.D.Pa. January 20, 1989); *Aquino v. Sommer Maid Creamery, Inc.,* 657 F.Supp. 208, 211 (E.D.Pa.1987) (allegations that plaintiff's work was supervised more

---

**4.** The court notes, however, that the exclusivity provisions of the PHRA do not foreclose an aggrieved employee from raising in a civil action other statutory remedies for discrimination such as Title VII. *Id.,* 559 A.2d at 921 n. 2; *see also Bruffett v. Warner Communications, Inc.,* 692 F.2d 910, 916 (3d Cir.1982) ("The option open to aggrieved employees is either to opt for relief under the provisions of the Pennsylvania statute [PHRA] or 'to seek the redress by other remedies that might be available.'") (quoting *Fye v. Central Transportation, Inc.,* 487 Pa. 137,

141, 409 A.2d 2, 4 (1979)). James opted for relief under the provisions of the PHRA.

**5.** Her belated effort to meet the PHRA requirements by filing a PHRC charge in February, 1989, some six months after she filed her federal complaint, does not cure the defect in her PHRA claim. Even if the filing of the PHRC charge somehow did so, the proper fora for the presentation of her PHRA claim are the "courts of common pleas of the Commonwealth." Section 962(c).

closely than her co-workers, plaintiff was followed into the women's bathroom by her male supervisor, plaintiff was stared at by her supervisor, plaintiff was harassed at home by repeated phone calls requesting that she return to work, and plaintiff was berated in front of co-workers for low work production do not amount to the level of atrocity necessary to support a claim for intentional infliction of emotional distress). James asserts that she was targeted for "relentless joking and harassment" between 1982 and 1984 by other non-management employees, called "bitch" on two occasions by another non-management employee, and berated by two of her managers in their offices an unspecified number of times during 1987 and 1988. Without delving into the issue of whether non-management employees can subject IBM to a claim for intentional infliction of emotional distress, I conclude that these acts, if taken as true, are not so outrageous or extreme to go beyond all bounds of decency. She may have been the subject of inequitable conduct, but that conduct does not cross the "threshold of decency into a realm of atrocity that could only be regarded as utterly intolerable in a civilized society." *Hooten v. Pennsylvania College of Optometry*, 601 F.Supp. 1151, 1154–55 (E.D.Pa.1984). IBM will be granted summary judgment on count V.

### C. Wrongful Discharge

James claims that IBM "violated the public policy of the Commonwealth" by discharging her "in retaliation for pressing her rights to worker's (sic) compensation benefits." Compl., count VI. This claim, I presume, is one for common law wrongful discharge. In its defense, IBM raises two arguments. First, IBM argues that neither the Pennsylvania legislature nor the state appellate courts have established a cause of action for wrongful discharge when a discharge is allegedly in retaliation for filing a workmen's compensation claim. Second, even if Pennsylvania does allow such a

cause, IBM asserts that James cannot produce any evidence in support of it. I conclude that discharging a employee for filing a compensation claim would be unlawful and provide the basis of a suit for damages.[6] However, while James states a valid cause of action, she has shown no facts to support it.

The parties' submissions show that in the first week of March, 1988, James complained of a variety of ailments which she claimed were a result of extensive work with a computer video display terminal. She was out on sick leave from March 10 to May 20, 1988. Throughout this and the other periods of absence, James was paid her entire salary. James received authorization from IBM's regional medical director to be out until May 23, 1988. No doctor who examined James during the period of her absence could find an objective reason for her purported illness. When she returned to work on May 23, her computer was equipped with a second anti-glare screen and she was given additional breaks each hour of work. Despite these accommodations, James continued to take a great number of sick days. On July 13, 1988, James was advised by IBM personnel that the IBM medical department considered her fit for work with no restrictions and that the failure to report to work would result in her dismissal. She returned, temporarily.

James again left work on September 14, 1988, after receiving a note from her neurologist stating that she was ill. The IBM medical staff requested, as permitted in the employee handbook, that James see a second, independent neurologist. That neurologist could not find any objective symptoms of illness. Psychological tests on James also did not show a legitimate illness. IBM ordered James back to work, but she refused. For a final time on October 25, 1988, James was told to return to work or face dismissal. On the next day, James arrived at work late and left early

---

6. *Accord Michelson v. Exxon Research and Engineering Company*, 629 F.Supp. 418, 426 (W.D.Pa. 1986), *aff'd*, 808 F.2d 1005, 1008 (3d Cir.1987); *Rettinger v. American Can Company*, 574 F.Supp. 306, 311 (M.D.Pa.1983); *Butler v. Negley House, Inc.*, 20 Pa.D. & C.3d 543 (1981). *Contra,*

*Lefever v. Lancaster Leaf Tobacco Company of Pennsylvania Inc.*, 46 Pa.D. & C.3d 421 (1987). *See generally,* Annotation, *Recovery for Discharge from Employment in Retaliation for Filing Workers' Compensation Claim*, 32 A.L.R.4th 1221 (1988).

against the express direction of her supervisor. She was discharged on October 27, 1988.

 James contends that her discharge was not a result of excessive and unexcused absences, as IBM asserts, but was the result of IBM's awareness of "plaintiff's claim of work-related illness prior to the discharge threat of July 13, 1988." Plf.'s resp., at 7. However, the fact that IBM knew of James' claimed illness does not establish that IBM knew James was about to file a workmen's compensation claim and discharged her to prevent her from doing so. IBM maintains that it first became aware of James' intention to file a workmen's compensation claim in late September, 1988, long after she had been warned that unauthorized absences would lead to dismissal. James attempts to rebut IBM's proffered reasons for her discharge by pointing to deposition testimony of her supervisor in which he states that he believed that she was ill on her last day of work. Once again, this has no relevance to the issue of why she was discharged. However James may have felt about the cause of her illness and whatever knowledge of her intentions she attributes to IBM, James did not file a claim for workmen's compensation or even tell IBM she planned to do so. James has presented no facts to support an inference that a retaliatory animus was the cause for her termination. IBM's position that it fired her because she missed too many days of work stands uncontroverted. In light of the uncontradicted non-retaliatory reason for James' termination, I find that no reasonable juror could conclude by a preponderance of the evidence that James was discharged in retaliation for "pressing her workers' (sic) compensation rights." *See Michelson v. Exxon Research and Engineering Company*, 629 F.Supp. 418 (W.D. Pa.1986), *aff'd*, 808 F.2d 1005 (3d Cir.1987) (summary judgment granted to defendant where plaintiff did not produce evidence from which the jury could infer the retaliatory motive for discharge and did not discredit defendant's response of legitimate business reasons for termination). Therefore, I will grant defendant summary judgment on count VI.

## D. Breach of Contract

 James' claim that IBM breached "written, oral and implied" contracts to pay her a full year's sick benefits is completely without merit. Even James' exhibit E attached to her response to the motion shows that benefit payments "cease on termination of employment." Exhibit E, IBM Sickness and Accident Plan. IBM guarantees an employee's regular salary for each day absent up to a maximum of fifty-two weeks in a period of twenty-four consecutive months. *Id.* However, if the employee is discharged, no payments need be made. Pursuant to the IBM plan, James received her salary while she was ill, but upon her discharge, those payments were properly stopped. She is not entitled to anything else. Since James has failed to state a claim for breach of contract, summary judgment will be granted on count VII in favor of the defendant.

## V. Damages and Jury Trial

 Because the only viable claims arise under Title VII, James is not entitled to compensatory damages for emotional distress, for pain and suffering, or for interest that would have been earned on lost wages, and to punitive damages. *Protos v. Volkswagen of America*, 797 F.2d 129 (3d Cir.), *cert. denied*, 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986). Title VII expressly authorizes only an award of back pay "or any other equitable relief as the court deems appropriate." *Protos*, 797 F.2d at 138; 42 U.S.C. § 2000e–5(g).

 James has requested a trial by jury. Title VII affords no right to trial by jury. *Lehman v. Nakshian*, 453 U.S. 156, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981).

## VI. Conclusion

The only remaining issue for trial is whether James can recover for alleged racial and gender discrimination occurring after October 22, 1986, in violation of Title VII. Summary judgment will be granted in favor of the defendants:

(1) on all claims contained in count I of the amended complaint and in James' sec-

ond EEOC charge relating to alleged acts of racial and gender discrimination occurring before October 22, 1986;

(2) on all claims contained in count I of the amended complaint and in James' PHRC charge relating to alleged acts of racial and gender discrimination violative of Title VII and occurring before June 22, 1988;

(3) on all claims contained in count I of the amended complaint but not raised in either the second EEOC or PHRC charges;

(4) on all claims of sexual harassment contained in counts I, II, and III of the amended complaint; and

(5) on counts II, III, IV, V, VI, and VII of the amended complaint.

Additionally, James will not be permitted to seek compensatory damages for emotional distress, for pain and suffering, or for interest that would have been earned on lost wages, or punitive damages from IBM. James will not try this case before a jury. Rulings on the admissibility of evidence will be reserved for trial.